## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

MATTHEW CHARLES   )
ROBINSON,      )
           )
    **Plaintiff,**  )
           )
     **v.**    )  **Case No. CIV-20-47-JFH-SPS**
           )
KILOLO KIJAKAZI,   )
**Acting Commissioner of the** )
**Social Security Administration,** [1] )
           )
    **Defendant.**  )

## REPORT AND RECOMMENDATION

The claimant Matthew Charles Robinson requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons discussed below, the undersigned Magistrate Judge RECOMMENDS that the Commissioner's decision be AFFIRMED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d)(1), Ms. Kijakazi is substituted for Andrew Saul as the Defendant in this action.

Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  *Id.* § 423 (d)(2)(A).  Social security regulations implement a five-step sequential process to evaluate a disability claim.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).  Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800

---

[2] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities.  If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied.  If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1.  If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry.  Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work.  At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC.  Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work.  *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

(10th Cir. 1991).  But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was thirty-five years old at the time of the most recent administrative hearing (Tr. 72).  He has a high school education and has worked as a cashier and driver/sales (Tr. 60, 337, 441).  The claimant alleges that he has been unable to work since January 1, 2014, due to bilateral ankle pain, rheumatoid arthritis, insomnia, nightmares, and major depression (Tr. 308, 336).

## Procedural History

In June 2015, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85 (Tr. 292-97, 308-11).  His applications were denied.  ALJ Trace Baldwin conducted an administrative hearing and a supplemental hearing, and determined that the claimant was not disabled in a written opinion dated March 19, 2019 (Tr. 41-62, 70-136).  The Appeals Council denied review, so the ALJ's written opinion is the Commissioner's final decision for purposes of this appeal.  *See* 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation.  He found that the claimant had the residual functional capacity ("RFC") to perform light work as defined

in 20 C.F.R. §§ 404.1567(b), 416.967(b) with frequent balancing; occasional stooping, kneeling, crouching, climbing ramps or stairs, and sitting or standing at the workstation without a loss in productivity; and never crawling or climbing ladders, ropes, or scaffolds (Tr. 46). The ALJ further found the claimant could understand, remember, and carry out simple work-related instructions and tasks; could work with supervisors and co-workers on a superficial work basis; could not work with the general public; and could adapt to routine changes in the working environment (Tr. 46-47). The ALJ then concluded that although the claimant could not return to his past relevant work, he was nevertheless not disabled because there was work he could perform in the national economy, *e. g.*, laundry worker, small parts assembler, and hand packer (Tr. 60-61).

### Review

The claimant contends that the ALJ erred by failing to properly evaluate the opinion evidence in this case, including the medical opinions of Dr. Harold DeLaughter, who performed a consultative physical examination; Dr. Dana Foley, who performed a consultative psychological examination; and Dr. Patricia Griffen, who testified as a medical expert psychologist at the supplemental hearing; as well as the other source opinion of counselor Hazel Southerland. The undersigned Magistrate Judge finds these contentions unpersuasive.

The ALJ found the claimant's posttraumatic stress disorder ("PTSD"), major depressive disorder, anxiety disorder, rheumatoid arthritis, and schizophrenia were severe impairments (Tr. 44). Relevant medical records prior to the alleged onset date of January 1, 2014 reflect that, Dr. J. R. Turrentine regularly treated the claimant for chronic and/or

-4-

multiple joint pain in his hands, elbows, shoulders, lumbar spine, and/or knees between February 2008 and August 2011 (Tr. 607-34). Dr. Turrentine did not record any physical examination findings at these appointments, but he consistently noted that the claimant's medications enabled him to work (Tr. 612, 616-19, 621, 624, 626, 628). At an appointment on July 16, 2010, Dr. Turrentine indicated the claimant "probably" had rheumatoid arthritis, which he diagnosed at the claimant's next appointment on September 8, 2010, noting the claimant took methotrexate and saw a rheumatologist (Tr. 618-19).[3]

From March 2012 through January 2015, Dr. Wellie Adlaon regularly treated the claimant for rheumatoid arthritis, lumbago, anxiety, and/or depression (Tr. 660-839). Dr. Adlaon's mental status, neurological, and/or neuropsychological examinations were consistently normal (Tr. 660-839). Additionally, Dr. Adlaon's physical examinations were consistently normal after the alleged onset date (Tr. 660-88). Prior to the alleged onset date, however, Dr. Adlaon noted abnormal physical examination findings on three occasions. Dr. Adlaon found tenderness at the claimant's left first carpometacarpal joint, tenderness and swelling at his left and right metacarpophalangeal joints, and tenderness and crepitus in his lumbar spine on April 30, 2012 (Tr. 832). He noted the claimant had swelling and squaring at his left first carpometacarpal joint, swelling and redness at his right first carpometacarpal joint, and tenderness and swelling at his left and right metacarpophalangeal joints on May 14, 2013 (Tr. 754). Dr. Adlaon found tenderness and swelling at the claimant's right and left first carpometacarpal joint, and pain with range of

---

[3] The record does not contain treatment notes from a rheumatologist.

motion testing on the right on November 14, 2013 (Tr. 710).

The claimant presented to Dr. Robert Horanzy on April 23, 2015, and reported swelling in his hands "at times," pain in his hands and joints, as well as taking more medication than prescribed (Tr. 868-70). On physical examination, Dr. Horanzy found distal phalanx flexion in the claimant's left index finger but no extension,[4] tenderness and mild spasm in his lumbar spine, mild crepitus and tenderness with range of motion testing in his knees, and pain with range of motion testing in his ankle (Tr. 869). Dr. Horanzy diagnosed the claimant with opioid abuse, arthralgia, and arthritis, and prescribed Suboxone, a benzodiazepine, and an antidepressant (Tr. 870). He also encouraged the claimant to set up counseling and ordered a blood test for rheumatoid arthritis, the results of which were negative (Tr. 870, 876). At a follow-up appointment on June 23, 2015, the claimant reported that he lost his job and had worsening depression and anxiety, paranoid thoughts, memory trouble, nightmares, and joint pain (Tr. 875). Dr. Horanzy indicated that the claimant may have PTSD from sexual abuse as a child and may need to see rheumatology (Tr. 876). The following month, the claimant reported racing thoughts and continuing nightmares and Dr. Horanzy's mental status examination was normal (Tr. 881).

On September 3, 2015, state agency physician Dr. Hollis T. Rogers completed a physical RFC assessment wherein he found the claimant could perform the full range of light work considering his subjective complaints of pain (Tr. 148-50). State agency physician Dr. Sean Neely affirmed this finding on review (Tr. 185-88).

---

[4] The claimant reported that a snake bit this finger.

On September 26, 2015, Dana D. Foley, Ph.D. performed a consultative psychological evaluation of the claimant (Tr. 854-57). She observed the claimant evidenced significant anxiety, had stuttered speech, and was tearful throughout the interview (Tr. 856). Dr. Foley found the claimant had normal thought process, appropriate thought content, good recall and memory, good concentration and attention, and adequate judgment and insight (Tr. 856). She stated that the claimant's mental health impairments impacted his occupational functioning and opined that it was unlikely he would be able to maintain employment because of his high anxiety level and that he was severely impaired from social relationships outside his immediate family (Tr. 857). Dr. Foley diagnosed the claimant with PTSD and major depression, recurrent, moderate (Tr. 856).

On September 28, 2015, state agency psychologist William H. Farrell, Ph.D. completed a mental RFC assessment wherein he found the claimant was moderately limited in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting, and was markedly limited in his ability to interact appropriately with the general public (Tr. 151-52). Dr. Farrell explained that the claimant could understand, remember, and carry out simple instructions; adapt to a workplace with minimal social requirements; and relate to others on a limited basis

regarding work, but could not work well with the public (Tr. 152). State agency psychologist Randy Cochran, Psy.D. affirmed these findings on review (Tr. 188-90).

Licensed professional counselor Hazel M. Southerland completed a mental RFC assessment on December 20, 2017 (Tr. 950-54). She found the claimant was markedly limited in fifteen of the twenty work-related mental abilities she assessed, moderately-to-markedly limited in one work-related mental ability, and moderately limited in four work-related mental abilities (Tr. 950-53). Ms. Southerland indicated that the claimant's anxiety/PTSD caused "serious limitations in all areas of his life," including interfering with his ability to "remember the simplest of instructions" when he is in public and/or in a social or work environment (Tr. 954). Ms. Southerland further stated the claimant's PTSD severely interferes with his daily activities in that he only takes a shower or bath every couple of months because he is afraid, has increased nightmares after showering or bathing, and has increased panic symptoms when shutting the bathroom door (Tr. 954).

The record does not contain evidence of treatment for any impairments related to the claimant's disability claim in 2016 or 2017, but Dr. Horanzy and Ms. Southerland regularly treated the claimant for opioid abuse, schizophrenia, PTSD, anxiety and depression from January 2018 through September 2018 (Tr. 989-1024). The claimant's symptoms waxed and waned at these appointments and the mental status examinations were normal, but Dr. Horanzy and Ms. Southerland consistently noted the claimant had an anxious mood and a congruent affect (Tr. 989-1024).

The ALJ called Patricia L. Griffen. Ph.D., a clinical psychologist, to testify as a medical expert at the supplemental hearing (Tr. 77-90, 1027-28). Dr. Griffen testified that

the record contained diagnoses of PTSD, major depressive disorder, opiate abuse, schizophrenia, and anxiety disorder, but that she did not find substantial evidence for a diagnosis of schizophrenia (Tr. 77-78). Dr. Griffen also testified that there was no evidence in the record that the claimant was being treated by a psychiatrist or receiving standard treatment for PTSD (Tr. 79-80). Nonetheless, she testified that the claimant met Listing 12.15 (Trauma and Stressor-Related Disorders) (Tr. 80, 84-85).[5] As support for her opinion, Dr. Griffen referenced Dr. Foley's discussion of the claimant's childhood sexual trauma, Dr. Horanzy's treatment notes describing the claimant's nightmares, Dr. Foley's opinion that the claimant is significantly impaired by his mental health, and the claimant's report that his family assists him in caring for his son (Tr. 80-85).

The ALJ also called Dr. Subramaniam Krishnamurthi, a board-certified internist and cardiologist, to testify as a medical expert at the supplemental hearing (Tr. 1025-1026). Dr.

---

[5] Listing 12.15 contains the following criteria: (i) "paragraph A" medical documentation criteria, (ii) "paragraph B" functional criteria, and (iii) "paragraph C" criteria for serious and persistent mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.15 (effective March 14, 2018 to April 1, 2021). In order to meet Listing 12.15, a claimant must satisfy the "paragraph A" medical documentation criteria and either the "paragraph B" criteria or the "paragraph C" criteria. *Id.* The "paragraph A" criteria require medical documentation of all of the following: (1) exposure to actual or threatened death, serious injury, or violence; (2) subsequent involuntary re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks); (3) avoidance of external reminders of the event; (4) disturbance in mood and behavior; and (5) increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance). The "paragraph B" criteria require proof that the claimant has an extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* The "paragraph C" criteria require that the claimant has a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence of both: (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of his mental disorder; and (2) marginal adjustment, that is, a minimal capacity to adapt to changes in his environment or to demands that are not already a part of his daily life. *Id.*

Krishnamurthi testified that the claimant was treated for chronic back pain, arthritis, rheumatoid arthritis, and chronic pain syndrome, but because there were no x-rays, objective findings, or abnormal physical examination findings, these impairments were non-severe (Tr. 91-93). Regarding the claimant's rheumatoid arthritis specifically, Dr. Krishnamurthi testified that the record did not contain any physical findings of synovitis, inflammation, swelling, or tenderness of the joints to support any limitations, and that such signs should be there to support ongoing rheumatoid arthritis, whether it is seropositive or not (Tr. 94-97, 101-02).

On January 24, 2019, Dr. DeLaughter performed a consultative physical examination of the claimant. (Tr. 1049-1054). He observed the claimant was quite anxious but pleasant, that his voice trembled, and that he ambulated with a stable but antalgic gait at a decreased speed. (Tr. 1050). Dr. DeLaughter found 4/5 painful grip strength in his hands bilaterally and opined the claimant could not effectively grasp tools such as a hammer (Tr. 1050, 1053). Dr. DeLaughter also found claimant had decreased range of motion and pain in his lumbosacral spine (Tr. 1054). He indicated that he did not "appreciate a lot of effusion of any joints" but noted the claimant "did guard a lot." (Tr. 1050). Dr. DeLaughter diagnosed the claimant with, *inter alia,* rheumatoid arthritis, migraine, depression, facet syndrome, PTSD, anxiety, and bipolar disorder (Tr. 1050).

That same day, Dr. DeLaughter completed a physical medical source statement of the claimant's ability to do work-related activities (Tr. 1055-60). Dr. DeLaughter indicated that the claimant could never lift/carry more than ten pounds, could sit in thirty-minute increments for a total of four hours, could stand in ten-minute increments for a total of one

hour, and could walk in ten-minute increments for a total of one hour, all in an eight-hour workday (Tr. 1056). Dr. Delaughter further indicated the claimant could occasionally use his hands for reaching, handling, fingering, feeling, and pushing/pulling, and could occasionally use his feet to operate foot controls (Tr. 1057). As to postural activities, Dr. DeLaughter found the claimant could frequently balance; occasionally climb stairs and ramps, stoop, and kneel; and could never climb ladders or scaffolds, crouch, or crawl (Tr. 1058). Dr. DeLaughter identified the claimant's rheumatoid arthritis as supporting his exertional, postural, and manipulative limitations (Tr. 1055-1057). Regarding environmental limitations, Dr. DeLaughter found the claimant could tolerate frequent exposure to moving mechanical parts; occasional exposure to humidity and wetness, dusts, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, and vibrations; and could never work around unprotected heights or operate a motor vehicle (Tr. 1059). He further indicated the claimant could not walk a block at a reasonable pace on rough or uneven surfaces but could perform other activities of daily living including shopping, traveling without a companion for assistance, preparing simple meals, and caring for personal hygiene (Tr. 1060). Dr. DeLaughter concluded that the limitations he identified had been present since 2008 (Tr. 1060).

In his written opinion, the ALJ summarized the hearing testimony and most of the medical records. At step three, the ALJ stated that he considered Listings 12.04, 12.06, and 12.15, and concluded that the claimant's impairments did not meet or medically equal any listing (Tr. 44-45). In discussing the opinion evidence at step four, the ALJ gave little weight to Dr. DeLaughter's consultative examination and medical source statement

-11-

because his limitations were largely based on the claimant's reports of rheumatoid arthritis, which the ALJ found was assessed without a significantly documented explanation; he did not quantify or justify his limitations other than to note "rheumatoid arthritis"; his examination was largely unremarkable; and he indicated the claimant's activities of daily living were largely unrestricted (Tr. 56-57). Regarding Ms. Southerland's medical source statement, the ALJ gave her findings and conclusions little weight, noting she was not an acceptable medical source and that the limitations she identified were not entirely supported by or consistent with the medical record as a whole, the claimant's activities of daily living, Dr. DeLaughter's consultative examination, or the medical experts' testimony (Tr. 57). The ALJ found Dr. Foley's consultative examination and findings were somewhat consistent with the record as a whole, but that the degree of limitations she assessed was not (Tr. 57-58). The ALJ gave little weight to her opinion because it was inconsistent with the claimant's largely uninhibited activities of daily living, his own function report, Dr. DeLaughter's consultative examination, the medical experts' hearing testimony, and the third-party function report completed by the claimant's stepfather (Tr. 58). The ALJ also gave little weight to Dr. Griffen's testimony that the claimant met Listing 12.15 because she primarily relied on Dr. Foley's consultative examination (which was based on the claimant's subjective and self-reported allegations) and because she did not support her conclusions or base her opinion on objective evidence (Tr. 58). As to Dr. Krishnamurthi's expert findings and opinions, the ALJ gave them great weight because they were consistent with and supported by the record as a whole, the claimant's consultative examination, the state agency consultants' findings, and the claimant's activities of daily living (Tr. 58-59).

The ALJ also gave great weight to the state agency physicians' opinion that the claimant could perform the full range of light work but included postural limitations in the RFC based on the claimant's testimony, the consultative examinations, and the medical expert testimony (Tr. 59). Lastly, the ALJ gave great weight to the state agency psychologists' opinion that the claimant could perform unskilled work with social and adaptation limitations, but indicated he gave further consideration in the RFC for the claimant's ability to understand, remember, and apply information (Tr. 60).

The claimant asserts that the ALJ erred in evaluating the medical source opinion evidence from consultative physician Dr. DeLaughter, consultative psychiatrist Dr. Foley, and medical expert Dr. Griffen. "An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional . . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart,* 365 F.3d 1208, 1215 (10th Cir. 2004) (*citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995)).[6] The pertinent factors include the following: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant

---

[6] The claimant filed his application for Title II and Title XVI benefits on June 4, 2015. The undersigned Magistrate Judge recognizes that for claims filed on or after March 27, 2017, medical opinions are evaluated under a different standard pursuant to 20 C.F.R. §§ 404.1520c, 416.920c.

evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-1301 (10th Cir. 2003) (*citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).

The claimant's specific complaint as to Dr. DeLaughter's opinion is that the ALJ ignored probative evidence in determining that the record lacked objective evidence of rheumatoid arthritis. As an initial matter, the undersigned Magistrate Judge notes the claimant appears to be operating under the incorrect assumption that the ALJ rejected Dr. DeLaughter's opinion entirely. While the ALJ rejected Dr. DeLaughter's exertional, manipulative, and environmental limitations, he adopted his rheumatoid arthritis diagnosis and found it was a severe impairment, incorporated his postural limitations in the RFC verbatim, and adopted his opinion that the claimant could perform numerous activities of daily living (Tr. 54-57). The claimant correctly points out that the ALJ did not discuss Dr. Turrentine's March 2008 finding of swelling in the claimant's hands and knuckle enlargement or Dr. Adlaon's April 2012, May 2013, and November 2013 abnormal findings hands set forth above (Tr. 632, 695, 754, 832). However, these findings predate the claimant's alleged onset date and were made while he was working (Tr. 346, 632). Thus, these pre-alleged onset date findings are not significantly probative and the ALJ was not required to discuss them. *See Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.") (citation omitted). Moreover, the ALJ did

not reject Dr. DeLaughter's rheumatoid arthritis diagnosis, rather he rejected the limitations Dr. DeLaughter identified based *solely* on the claimant's rheumatoid arthritis because there was no objective evidence to support any limitations from rheumatoid arthritis during the relevant period (Tr. 54-57).

Relatedly, the claimant asserts that the ALJ ignored Dr. Horanzy's April 2015 findings set forth above as well as the rheumatoid arthritis diagnosis made by Drs. Turrentine, Webb, Adlaon, Fitchenburg, and Savage, but this is not borne out in the record. In his summary of the evidence, the ALJ specifically discussed Dr. Horanzy's April 2015 treatment note, most of Dr. Adlaon's treatment notes during the relevant period, Dr. Fitchenburg's February 2015 treatment note, and Dr. Savage's March 2015 treatment note (Tr. 47-50). "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton*, 79 F.3d at 1009-1010. Although the ALJ did not recount every one of Dr. Horanzy's April 2015 examination findings or every instance where the claimant was diagnosed with rheumatoid arthritis, he clearly considered Dr. Horanzy's examination and the claimant's rheumatoid arthritis diagnoses (Tr. 47-50).

The claimant similarly asserts that the ALJ failed to discuss his own reports of joint pain and his statements about the limited nature of his daily activities, but this is also not borne out in the record. After providing a thorough summary of the medical evidence, opinion evidence, the claimant's testimony from both administrative hearings, both of the claimant's function reports, and the third party function report completed by the claimant's stepfather, the ALJ concluded that "the claimant's statements about the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the medical and other evidence in the

record[.]" (Tr. 47-56).  The ALJ then gave numerous reasons, supported by the record to discount the claimant's subjective statements (Tr. 55-56).  Notably, the claimant does not contest the ALJ's consistency analysis conclusions, and the ALJ and state agency physicians included limitations in the RFC assessment to specifically account for the claimant's pain (Tr. 59, 150, 188).

Regarding Dr. Foley's opinion, the claimant asserts the ALJ improperly relied on his ability to perform daily activities in rejecting her opinion that the claimant was unlikely to be able to return to work due to his mental health limitations.  However, as set forth above, the ALJ properly considered the claimant's subjective statements, including his allegations related to his daily activities, as well as Dr. DeLaughter's opinion, and the undersigned Magistrate Judge finds this was a legitimate basis for finding this aspect of Dr. Foley's opinion not supported by the record.  Additionally, the claimant's daily activities were not the sole reason the ALJ discounted Dr. Foley's opinion (Tr. 58).  The ALJ also found her opinion was inconsistent with the record as a whole (reflecting consistently normal mental status examinations), Dr. DeLaughter's consultative examination (which the ALJ noted was "relatively normal"), the medical experts' testimony (Dr. Krishnamurthi testified the claimant's physical impairments were non-severe), and the third-party function report submitted by the claimant's stepfather (Tr. 57-58).  In any event, the ALJ was not required to attach any special significance to Dr. Foley's statement that the claimant was unable to work because the determination of disability is reserved for the Commissioner.  *See* Soc. Sec. Reg. 96-5p, 1996 WL 374183, at \*2 (July 2, 1996).[7]

---

[7] SSR 96–5p has been rescinded but remains in effect for claims filed before March 27, 2017.

The claimant also asserts that the ALJ failed to consider Dr. Foley's opinion that he was severely impaired from social relationships outside his immediate family. "It is the ALJ's duty to give consideration to all the medical opinions in the record. He must also discuss the weight he assigns to such opinions." *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (*quoting Keyes-Zachary v. Astrue*, 689 F.3d 1156, 1161 (10th Cir. 2012)). However, the need for express analysis is weakened "[w]hen the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC." *Id.* (*quoting Keyes-Zachary*, 695 F.3d at 1162). Additionally, an ALJ's failure to weigh a medical opinion is harmless error if the opinion is "not inconsistent" with the RFC. *Id.* at 578-579 (*citing Keyes-Zachary*, 695 F.3d at 1162-63). Here, the claimant correctly points out that the ALJ did not explicitly discuss Dr. Foley's opinion concerning social relationships outside the claimant's immediate family, but the ALJ nonetheless included social interaction limitations as to supervisors, co-workers, and the general public in the RFC assessment (Tr. 46-47, 51, 57-58). Given these limitations and the fact that Dr. Foley did not preclude social interaction outside the claimant's immediate family, remand to evaluate her opinion is not warranted. S*ee Keyes-Zachary*, 695 F.3d at 1163 (finding the ALJ's failure to assign a specific weight to a consulting examiner's opinion was harmless error where the opinion was generally consistent with the ALJ's RFC findings).

The claimant next asserts the ALJ failed to properly evaluate Dr. Griffen's opinion that the claimant met Listing 12.15 (Trauma and Stressor-Related Disorders). He claims it was error for the ALJ to reject her opinion on the basis that she primarily relied on Dr. Foley's discussion of the claimant's self-reported allegations and points out that Dr. Foley also

-17-

recorded findings of her own, including, *inter alia,* the claimant's very tense posture, very anxious behavior, and depressed affect (Tr. 854-857). However, these examination findings are not sufficient to overcome the substantial evidence that supports the ALJ's conclusion at step three that the claimant does not meet Listing 12.15 (Tr. 44-45). Additionally, the ALJ made it clear he did not base his rejection of Dr. Griffen's opinion due to her reliance on Dr. Foley's examination alone. The ALJ more pertinently rejected Dr. Griffen's opinion because she did not draw her conclusions or base her opinion on objective medical findings (Tr. 58). This was a particularly valid reason to reject Dr. Griffen's opinion, given that the ALJ properly discounted the claimant's subjective statements as set forth above, and given that Dr. Griffen she did not discuss the paragraph B or paragraph C criteria (Tr. 80-85). In order to meet Listing 12.15, a claimant must satisfy the "paragraph A" medical documentation criteria and either the "paragraph B" functional criteria or the "paragraph C" criteria for serious and persistent mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.15 (effective March 14, 2018 to April 1, 2021). Thus, Dr. Griffen would be required to reference objective medical findings other than Dr. Foley's consultative report to determine whether the claimant satisfied either the paragraph B or the paragraph C, and ultimately whether he met Listing 12.15. Her failure to do so was a valid reason to reject her opinion. Moreover, the claimant does not point to any evidence other than Dr. Griffen's opinion to support a finding that he meets Listing 12.15, nor does he contest the ALJ's findings at step three.

The claimant last argues that the ALJ erred in evaluating Ms. Southerland's medical source statement. Social Security regulations provide for the proper consideration of

"other source" opinions such as the one provided by Ms. Southerland. *See, e. g., Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (noting that other source opinions should be evaluated with the relevant evidence "on key issues such as impairment severity and functional effects" under the factors in 20 C.F.R. §§ 404.1527, 416.927), *quoting* Soc. Sec. Rul. 06-03p, 2006 WL 2329939 at *3, *6 (Aug. 9, 2006) ("[T]he adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The factors for evaluating opinion evidence from "other sources" include: (i) the length of the relationship and frequency of contact; (ii) whether the opinion is consistent with other evidence; (iii) the extent the source provides relevant supporting evidence; (iv) how well the source's opinion is explained; (v) whether claimant's impairment is related to a source's specialty or area of expertise; and (vi) any other supporting or refuting factors. *See* Soc. Sec. Rul. 06–03p, at *4–5; 20 C.F.R. § 404.1527(c), 416.927(c). The ALJ's treatment of Ms. Southerland's opinion meets these standards. The ALJ correctly noted that as a counselor, Ms. Southerland was not an acceptable medical source (Tr. 57). The claimant contends it was error for the ALJ to reject Ms. Southerland's opinions that his anxiety and/or PTSD interfere with his ability to remember "the simplest of instructions" anytime he is in public or in a social or work environment, and that it causes serious limitations in all areas of his life, in part, on the basis of his ability to perform activities of daily living. However, a review of the record reveals a significant discrepancy between Ms. Southerland's statements regarding the

claimant's extremely limited ability to maintain personal hygiene, the claimant's own testimony, the third-party function report, and Dr. DeLaughter's opinion (Tr. 356, 364, 382, 954, 1060). Moreover, the ALJ did not reject Ms. Southerland's opinion on this basis alone. The ALJ also found Ms. Southerland's opinion inconsistent with and unsupported by the longitudinal medical treatment record (containing consistently normal mental status examinations, including those performed by Ms. Southerland), Dr. DeLaughter's consultative examination (which indicates the claimant is able to perform a number of daily activities), the testimony of Dr. Griffen (indicating there was no evidence that the claimant was seeing a psychiatrist for his mental impairments or receiving the standard treatment for PTSD), and the testimony of Dr. Krishnamurthi (Tr. 47). This was sufficient to allow the undersigned Magistrate Judge to follow his reasoning. Although not identified by the ALJ as a reason to discount Ms. Southerland's opinion, the undersigned Magistrate Judge nonetheless notes that Ms. Southerland issued her opinion in December 2017, but the record contains no evidence that she treated the claimant until March 2018 (Tr. 954, 1016-17).

When all the evidence is taken into account, the undersigned Magistrate Judge is satisfied that the ALJ's conclusion that the claimant could perform the assigned RFC is supported by substantial evidence. The ALJ specifically noted the medical records available in this case, gave reasons for his RFC determination, and ultimately found that the claimant was not disabled. *See Hill v. Astrue*, 289 Fed. Appx. 289, 293 (10th Cir. 2008) ("The ALJ provided an extensive discussion of the medical record and the testimony in support of his RFC finding. We do not require an ALJ to point to 'specific, affirmative,

medical evidence on the record as to each requirement of an exertional work level before [he] can determine RFC within that category.'") (*quoting Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004)). This was "well within the province of the ALJ." *Corber v. Massanari*, 20 Fed. Appx. 816, 822 (10th Cir. 2001) ("The final responsibility for determining RFC rests with the Commissioner, and because the assessment is made based upon all the evidence in the record, not only the relevant medical evidence, it is well within the province of the ALJ.") (*citing* 20 C.F.R. §§ 404.1527(e)(2); 404.1546; 404.1545; 416.946). The essence of the claimant's appeal is that the undersigned Magistrate Judge should reweigh the evidence and reach a different result, which the undersigned Magistrate Judge simply may not do. *See, e. g., Casias*, 933 F.2d at 800. Accordingly, the decision of the Commissioner should be affirmed.

## Conclusion

The undersigned Magistrate Judge finds that the ALJ applied the correct legal standards, and that the decision of the Commissioner is supported by substantial evidence. Accordingly, the Magistrate Judge RECOMMENDS that the ruling of the Commissioner of the Social Security Administration be AFFIRMED. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 9th day of September, 2021.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**